STATE OF NORTH CAROLINA v. DWIGHT ANTHONY CLODFELTER AND
JAMES KEVIN JESSUP, DEFENDANTS

No. COA09-356

(Filed 16 March 2010)

**1. Confessions and Incriminating Statements— references to
defendant altered—Bruton violation—harmless error**

The trial court did not err by admitting into evidence a con-
fession made by a co-defendant where all references in the state-
ment to the objecting defendant were altered pursuant to
N.C.G.S. § 15A-927(c)(1), and even if a *"Bruton* violation"
occurred, the error was harmless.

**2. Criminal Law— jury instructions—referring to co-
defendants as defendants—not plain error**

The trial court did not commit plain error by referring to the
co-defendants as "defendants" throughout the jury instructions
because, given the evidence at trial, defendant cannot show that
the error had a probable impact on the jury's finding defend-
ant guilty.

**3. Homicide— first-degree murder—jury instructions—
duress and second-degree murder—no error**

The trial court did not err in a first-degree murder trial by not
instructing the jury on the defense of duress or the lesser-
included offense of second-degree murder. Defendant was found
guilty of first-degree murder on the basis of premeditation and
deliberation, and duress is not a defense to first-degree murder
under these theories. Moreover, the State pursued only a theory
of first-degree murder and defendant was not entitled to an
instruction on second-degree murder merely because the jury
might not have believed all of the State's evidence.

**4. Constitutional Law— ineffective assistance of counsel—no
request to record opening and closing statements**

Defendant's argument that he did not receive effective assis-
tance of counsel in a first-degree murder trial because his coun-
sel did not request that the court reporter record counsels' open-
ing and closing statements was overruled. The statute does not
require that opening and closing statements be recorded in a non-
capital trial and defendant did not suggest how the omission prej-
udiced his case.

STATE v. CLODFELTER

[203 N.C. App. 60 (2010)]

**5. Confessions and Incriminating Statements— pre-trial motion to suppress—not properly preserved—not plain error**

Defendant's argument that the trial court erred by denying his motion to suppress a written statement given to police was not properly preserved for appeal where defendant failed to object to the reading of this statement aloud during his trial testimony, or to the statement being introduced into evidence. Reviewed under a plain error standard, defendant failed to show that, had the statement not been admitted, there was a reasonable possibility of a different result.

**6. Confessions and Incriminating Statements— pre-trial motion to suppress—interrogation not by agent of police**

The trial court did not err by denying defendant's motion to suppress a written statement given to police because defendant's mother did not act as an agent of the police by asking her son to tell the truth about his involvement in the murder at issue.

**7. Confessions and Incriminating Statements— pre-trial motion to suppress**

The trial court did not err by denying defendant's motion to suppress a written statement given to police since defendant's statement was not involuntary because defendant did not request a lawyer and his offer to continue speaking with police officers the following day showed that he was willing to talk with officers.

**8. Confessions and Incriminating Statements— pre-trial motion to suppress—not properly preserved—not plain error**

Defendant's argument that the trial court erred by granting the State's motion for joinder and by not redacting a statement given to police by a co-defendant was overruled. Defendant failed to properly preserve for appeal the issue of the introduction into evidence of his statement. Reviewed under a plain error standard, defendant failed to show that, had the statement not been admitted, there was a reasonable possibility of a different result.

Appeal by defendants from judgment entered 15 September 2008 by Judge L. Todd Burke in Forsyth County Superior Court. Heard in the Court of Appeals 29 September 2009.

*Mark Montgomery for defendant Clodfelter; M. Alexander Charns for defendant Jessup.*

*Attorney General Roy Cooper, by Assistant Attorney Generals Charles E. Reece and LaToya B. Powell, for the State.*

ELMORE, Judge.

Dwight Anthony Clodfelter (defendant Clodfelter) and James Kevin Jessup (defendant Jessup) appeal from their convictions for first degree murder, robbery with a dangerous weapon, and two counts of larceny of a firearm. Both were sentenced to a term of life imprisonment without the possibility of parole.

On 27 September 2005, Kimberly Alan Tuttle was murdered in his home when three men broke into his home to steal firearms he kept there. The three men were eventually identified as defendant Clodfelter, defendant Jessup, and Marcus Bowen. Details of the incident, particularly which of the men shot the victim, were the subject of much dispute at trial. Defendants gave conflicting statements to the police investigating the incident; those statements are outlined below.

I.

### Defendant Jessup's Statement

During his testimony, SBI Special Agent Scott Williams read both the *Miranda* waiver signed by defendant Jessup and defendant Jessup's signed statement to the police made immediately thereafter. That statement narrated the events of 27 September 2005 as follows[1]:

That morning, a man named Marcus called defendant Jessup and said he was coming to pick him up; Marcus and defendant Clodfelter then picked Jessup up. Defendant Clodfelter gave Marcus directions to a house in Kernersville that apparently belonged to a female friend of defendant Clodfelter. On the first pass, they missed the house and had to turn around and go back, but noted two cars in the driveway; when they returned, only a truck was in the driveway. The men parked the car; defendant Jessup stayed in the car while Marcus and defendant Clodfelter went up to the house. After ringing the doorbell and getting no answer, Marcus and defendant Clodfelter went around

---

1. While reading the statement, Special Agent Williams substituted the phrase "one or other persons" for defendant Clodfelter's name per the trial court's earlier ruling on that point. For ease of understanding, we have reverted to defendant Clodfelter's name here.

the back of the house out of defendant Jessup's sight; they returned several minutes later and motioned for defendant Jessup to join them.

The men walked into the house through the door from the garage, passing a small room on the right into which defendant Clodfelter had gone. Marcus told defendant Jessup to go upstairs, which he did; not seeing anyone there, defendant Jessup returned downstairs to join the others. At that point he entered the small room to find a man lying on the floor and defendant Clodfelter "stuffing guns into his pants"; defendant Clodfelter then told defendant Jessup to "start loading all these guns up." As defendant Jessup helped Marcus transfer the guns from the gun shelf out to the car, defendant Clodfelter told him "to help him get these guns or end up like" the man on the floor. Marcus and defendant Jessup then went upstairs and took a PlayStation console, which defendant Jessup took to the car; a few minutes later Marcus and defendant Clodfelter came out of the house with a number of additional items, which they added to the trunk. As they drove back to Winston-Salem, defendant Clodfelter and Marcus began arguing about "why [defendant Clodfelter] had to shoot the man." Defendant Clodfelter told Marcus "it was done now so no more talking about this to anybody ever." Defendant Clodfelter told defendant Jessup "not to ever speak about this again or we will get you."

## Defendant Clodfelter's Statement

During his testimony, SBI Special Agent Danny Mayes read both the *Miranda* waiver signed by defendant Clodfelter and defendant Clodfelter's signed statement to the police made immediately thereafter. That statement narrated the events of 27 September 2005 as follows[2]:

Defendant Clodfelter had planned to rob the house of a former high school classmate where he knew shotguns were kept. He suggested the plan to Marcus, who was interested; Marcus suggested including defendant Jessup, whose full name defendant Clodfelter did not know, but whom he described as "a light-skinned black male with short hair[,] . . . about 6'1" or 6'2"," weighing around 200 pounds. After picking defendant Jessup up in a car, the three men drove to where defendant Clodfelter thought the house was. They pulled into the driveway and saw someone at the house, so they returned to the car and drove to a nearby street to wait.

---

2. While reading the statement, Special Agent Mayes substituted the phrase "one or more other persons" for defendant Jessup's name per the trial court's earlier ruling on that point. For ease of understanding, we have reverted to defendant Jessup's name here.

After smoking a cigarette, they got back in the car and returned to the house, where they discovered that a car that had been parked in the driveway on their first pass was now gone. Marcus pulled into the driveway and parked. Marcus and defendant Clodfelter went to the back of the house and up some stairs to a deck; the men considered breaking in that door, but then entered the house through the door in the garage. At some point in this time defendant Jessup joined them.

They discovered a man on the phone in an interior room, then explored the upper floors of the house, "trying to be quiet so the man did not know we were there." Not seeing any guns, defendant Clodfelter began "grabbing other stuff[,]" including an Xbox; defendant Jessup took those items to the car. The men then went downstairs, at which point defendant Jessup stated, referring to the small room near the garage where they had seen a man on the phone: "This is the only room we have not been in. . . . This has got to be where the guns are." Defendant Jessup then tried the doorknob, which was locked; he then kicked the door open and all three men entered the room. The man inside grabbed a gun from the gun safe and fired, at which point Marcus and defendant Clodfelter ran from the room; meanwhile, defendant Jessup began "tussling" with the man. Defendant Clodfelter "grabbed five or six shotguns from the safe" and took them to the car.

Defendant Clodfelter then returned to the room with the gun safe, where he found defendant Jessup and Marcus "wrestling" with the man on the floor for his gun. Defendant Clodfelter took five or six "long guns" and took them to the car, where he put them in the trunk. When he returned to the room, the three men were still wrestling on the floor; the man said that if they let him up, he would not shoot. During this time defendant Jessup was "beating [the victim] in the head with his hands." Marcus told defendant Clodfelter, referring to the victim: "Shoot him. Either he is going to shoot me, or I'm going to shoot him." Defendant Clodfelter took a revolver from the gun safe and shot the victim in the head from five to six feet away. Marcus and defendant Jessup had been pinning the man down until then; when defendant Clodfelter shot the victim, Marcus jumped up and asked whether any of the three of them had left fingerprints in the house. The three men took the gun used to shoot the victim and the remaining guns in the room and left the house. Marcus then drove them away.

## II.

### Defendant Jessup's Arguments

A. *Redacted Confession without a Limiting Instruction*

[1] Defendant Jessup first argues that the trial court erred by admitting his confession without either severing the trial or giving a limiting instruction to the jury. We disagree.

On 26 August 2008, defendant Clodfelter made a motion to suppress his statement (described above). On 28 August 2008, the State made a motion for joinder of the trials of defendants Clodfelter and Jessup. Defendant Jessup filed an objection to the motion as well as a motion for severance, arguing that the State intended to introduce defendant Clodfelter's statement (described above), which would incriminate defendant Jessup. At a hearing on 8 September 2008, the trial court allowed joinder and held that defendant Clodfelter's statement could be admitted so long as it was "sanitized" with regard to any identification of defendant Jessup.

This ruling was made pursuant to N.C. Gen. Stat. § 15A-927(c)(1), which states:

> When a defendant objects to joinder of charges against two or more defendants for trial because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court must require the prosecutor to select one of the following courses:
>
> a. A joint trial at which the statement is not admitted into evidence; or
>
> b. A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted so that the statement will not prejudice him; or
>
> c. A separate trial of the objecting defendant.

N.C. Gen. Stat. § 15A-927(c)(1) (2009). When none of the three solutions is properly implemented, the error is termed a "*Bruton* violation" pursuant to the Supreme Court's holding in *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968). That violation has been articulated by our state Supreme Court as follows: "in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can

be deleted without prejudice either to the State or the declarant." *State v. Fox*, 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968).

At trial, Special Agent Mayes read defendant Clodfelter's statement into the record and altered all references to defendant Jessup from his name to the phrase "one or more other persons." Defendant Jessup argues that this alteration was not sufficient, and that thus the trial court's admission of it was in error. He further argues that it was an error that could have been cured by either severance or limiting jury instructions, and the absence of both also constitutes error. We disagree.

This Court has specifically held that "[a] *Bruton* violation does not automatically require reversal of an otherwise valid conviction[,]" and that this Court may apply a harmless error analysis in such situations. *State v. Hayes*, 314 N.C. 460, 469-70, 334 S.E.2d 741, 747 (1985), *reversed in part on other grounds*, 323·N.C. 306, 372 S.E.2d 704 (1988). The situation in *Hayes* was quite similar to the case at hand:

> In their confessions, each defendant admitted having participated in the planning of the burglary and to being present at the [victims'] home at the time of burglary. The only discrepancies among the confessions revolved around the issue of who actually assaulted the [victims]. However, it is well established that where two or more persons join together to commit a crime, each of them, if actually or constructively present, is guilty of the particular crime and any other crime committed by the other or others in furtherance of or as a natural consequence of the common purpose. The assaults on the [victims] and the subsequent death of [one victim] as a result of the beating inflicted upon him were clearly in furtherance of or a natural consequence of the burglary committed by all three defendants. The question of which of the defendants actually committed the assaults was irrelevant to the jury verdicts finding each of the defendants guilty of all of the crimes charged. The interlocking confessions combined with the fact that certain items taken from the [victims' home] were found in the possession of some of the defendants provided overwhelming evidence of each defendant's guilt as to each charge and any *Bruton* error which *may* have occurred was harmless beyond a reasonable doubt.

*Id.* at 470, 334 S.E.2d at 747 (citations omitted). Here, each defendant's statement implicated his co-defendant; the statements agreed on

every key point of the crime except the specific impetus for defendant Clodfelter's shooting of the victim. As such, even assuming *arguendo* that a *Bruton* violation occurred, we cannot see that a different result would likely have been reached had it not occurred; as such, defendant Jessup is not entitled to a new trial on this basis. N.C.G.S. § 15A-1443(a) (2009); *see Hayes* at 470, 334 S.E.2d at 747. Because we find any error to be harmless, we overrule defendant Jessup's further arguments that an error occurred that needed remedying by a limiting instruction to the jury. We also note that "a trial court's ruling on the consolidation or severance of cases is discretionary and will not be disturbed absent a showing of abuse of discretion"; defendant Jessup has not shown that the trial court's ruling was "so arbitrary that it could not have been the result of a reasoned decision[,]" and as such we also overrule this argument. *Hayes* at 471, 334 S.E.2d at 747.

**[2]** Finally, defendant Jessup argues that the trial court's reference to co-defendants Jessup and Clodfelter throughout the jury instructions as "defendants" lumped their guilt or innocence of the charges together impermissibly. Defendant Jessup did not object at trial, making our review of this argument pursuant to the plain error standard of review. N.C. R. App. Proc. 10(b)(4) (2008). Reversing a jury verdict based on plain error is appropriate when "it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *State v. Black*, 308 N.C. 736, 740-41, 303 S.E.2d 804, 806-07 (1983) (quotations and citations omitted). Again, given the evidence presented at trial, defendant Jessup cannot show that such an impact was made by the trial court's misspeaking during the instructions to the jury. As such, this argument is overruled.

### B. *Instructions on Duress & Second Degree Murder*

**[3]** Next, defendant Jessup argues that the trial court erred by not instructing the jury on the defense of duress and by not submitting the lesser-included offense of second degree murder to the jury. We disagree.

At trial, defendant Jessup's attorney had the following colloquy with the court regarding an instruction on duress:

[DEFENDANT JESSUP'S ATTORNEY]: Your Honor, the only thing that comes to mind, and I do not have a specific instruction, there was testimony from Special Agent Williams regarding Mr. Jessup's statement that he was threatened by Mr. Clodfelter to

act, or he would end up like Mr. Tuttle. I don't know if there's an instruction regarding threat or coercion actions.

\* \* \*

THE COURT:  Um-hum. And the purpose of that would be for?

[DEFENDANT JESSUP'S ATTORNEY]:  I'm just bringing it to the Court's attention. I—I haven't researched that.

THE COURT:  I don't think there would be an instruction appropriate for that.

At best, these statements by defendant Jessup's attorney constitute a vague allusion to a request for a duress requirement. As such, we do not consider that a request was properly made for the instruction and thus review for plain error. N.C. R. App. Proc. 10(b)(4) (2008).

First, we note again that defendant Jessup was convicted of first degree murder; specifically, the jury returned verdicts of guilty of first degree murder on the basis of both premeditation and deliberation and under the felony murder rule. Duress is not a defense to first degree murder. *State v. Cheek*, 351 N.C. 48, 61, 520 S.E.2d 545, 553 (1999). As defendant Jessup correctly states, it *is* a defense to certain felonies, and had the jury found that defendant Jessup committed that underlying felony under duress, he could not therefore be guilty of felony murder. However, even were that the case, as defendant Jessup was *also* found guilty on the basis of premeditation and deliberation, he would still be guilty of first degree murder. As such, this argument is overruled.

As to defendant Jessup's arguments regarding inclusion of the lesser included offense of second degree murder, we note that

a trial court must submit a lesser included offense instruction if the evidence would permit a jury rationally to find defendant guilty of the lesser included offense and acquit him of the greater. However, if the State tries the case on an "all or nothing basis," seeking a conviction only on the greater offense, then the trial court needs to present an instruction on the lesser included offense only when the defendant presents evidence thereof or when the State's evidence is conflicting.

*State v. Woody*, 124 N.C. App. 296, 307, 477 S.E.2d 462, 467 (1996) (quotations and citations omitted). The question, then, is whether either defendant Jessup presented evidence of second degree murder

or the State's evidence was conflicting. As the State notes, the only evidence to which defendant Jessup points in support of this contention is the conflict between his own statement to police and his co-defendant Clodfelter's statement to the police. As our Supreme Court noted when considering the same question—submitting second degree murder where the State pursued only a theory of first degree murder—"A defendant is not entitled to an instruction on a lesser included offense merely because the jury could possibly believe some of the State's evidence but not all of it." *State v. Annadale,* 329 N.C. 557, 568, 406 S.E.2d 837, 844 (1991). As such, this argument is overruled.

## C. *Ineffective Assistance of Counsel*

[4] Finally, defendant Jessup argues that he received ineffective assistance of counsel based solely on the fact that his trial counsel did not request that the court reporter record the attorneys' opening and closing statements.

The standard for determining whether a defendant received ineffective assistance of counsel is as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*State v. Braswell,* 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984)) (emphasis removed).

As to the first requirement—a severe error by trial counsel—per statute, opening and closing statements need not be recorded in a noncapital trial. N.C. Gen. Stat. § 15A-1241(a)(2) (2007). This Court has repeatedly applied this statute to uphold cases in which these statements and more were omitted from the record. *See, e.g., State v. Verrier,* 173 N.C. App. 123, 129-30, 617 S.E.2d 675, 679-80 (2005) (upholding conviction where jury selection, bench conferences, and the attorneys' opening and closing arguments were not recorded, and the defendant made no motion that they be recorded); *State v. Price,* 170 N.C. App. 57, 67, 611 S.E.2d 891, 898 (2005) (upholding convic-

tions where jury selection, jury instructions, bench conferences, and arguments of counsel were not recorded, and the defendant was not able to show prejudice from the omission).

As to the second requirement—the showing of prejudice—defendant Jessup does not suggest how the omission of the opening and closing statements prejudiced his case, except that various errors *might* have been made therein upon which an argument *might* be made on appeal. As we stated in *State v. Thomas,*

> a defendant cannot establish ineffective assistance of counsel for failure to request recordation of the jury selection and bench conferences where no specific allegations of error were made and no attempts were made to reconstruct the transcript. Moreover, this Court has held that a defendant cannot establish prejudice as a result of defense counsel's failure to request recordation of those items specifically exempted from the recording statute.

187 N.C. App. 140, 147, 651 S.E.2d 924, 928 (2007). As such, this argument is overruled.

<u>Defendant Clodfelter's Arguments</u>

A. *Motion to Suppress*

First, defendant Clodfelter argues that the trial court erred in denying his motion to suppress the above statement elicited by the police. We disagree.

In essence, defendant Clodfelter makes three separate arguments based on three sets of circumstances: first, the timing of the *Miranda* warnings given to him; second, the role of his mother, Angela Clodfelter, in obtaining the statement; and, third, his alleged requests for a lawyer and to leave the station.

1. *Timing of* Miranda *Warnings*

[5] As to the first, defendant Clodfelter argues that, because his written statement was made after he signed a *Miranda* waiver, but his oral statement giving the same information was made before he signed the waiver, the waiver was ineffective, and thus a new trial is necessary. We disagree.

The facts regarding the timing of events at the police station is in dispute, but generally both sides agree that the following sequence of events took place: defendant Clodfelter was interviewed by Detective Walls for some period of time; Ms. Clodfelter then joined them in the

interview room and encouraged defendant Clodfelter to talk to Detective Walls and Special Agent Mayes; defendant Clodfelter made incriminating statements; defendant Clodfelter then signed a *Miranda* form waiving his rights; and then defendant Clodfelter gave the formal statement above, which was written down by Special Agent Mayes.

Defendant Clodfelter argues that, because the written statement was essentially a memorialization of the oral statement he gave without having waived his rights, the written statement should not have been admitted as evidence, as it was tainted by the pre-*Miranda* statement. *See, e.g., Missouri v. Seibert*, 542 U.S. 600, 616-17, 159 L. Ed. 2d 643, 657-58 (2004) (holding that, where a second interrogation post-*Miranda* attempted to recreate a first interrogation pre-*Miranda*, statement from the latter was inadmissible). However, while defendant Clodfelter made a motion *in limine* to suppress the statement, he did not object to Special Agent Mayes reading his statement aloud during his testimony, nor to the statement being introduced into evidence. Defendant Clodfelter therefore did not properly preserve this issue for appeal, and we review the argument for plain error. *See State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198 (2000). As such, defendant Clodfelter must show "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" N.C. Gen. Stat. § 15A-1443(a) (2009). This he cannot do. Disregarding defendant Clodfelter's statement, at trial Marcus Bowen testified that defendant Clodfelter planned and orchestrated the robbery and shot the victim. Defendant Jessup's statement gave the same information. Thus, defendant Clodfelter cannot show that, had the statement not been admitted, there is a reasonable possibility of a different result, and so this argument is overruled.

## 2. *Role of Ms. Clodfelter*

**[6]** Defendant Clodfelter's second argument centers on his mother's participation in eliciting his statement at the police station. There is some dispute as to the exact events and their timing, but according to Ms. Clodfelter's testimony, she and defendant Clodfelter were met at on the lawn of their house by police officers, including Kernersville Police Detective Joe Walls, whom Ms. Clodfelter knew as the coach of her daughter's soccer team. Detective Walls told Ms. Clodfelter that the reason the officers were there "ha[d] to do with Marcus Bowen." Defendant Clodfelter then said to her "We should call a lawyer, Mom. You should call a lawyer." After escorting Ms. Clodfelter

and her two younger children inside the house to use the bathroom, she and Detective Walls came back out to the lawn, where Detective Walls told "us to come to the police department and talk to him." Ms. Clodfelter then told defendant Clodfelter "if he didn't have anything to hide, and he hadn't done anything wrong, then [she] felt like we should go to the police department and talk to them." Ms. Clodfelter was allowed to drive defendant Clodfelter to the police station in her own car, escorted by the officers in their unmarked cars.

Once at the station, Detective Walls asked defendant Clodfelter to come speak with him alone, telling Ms. Clodfelter he would return to fetch her in ten minutes. Ms. Clodfelter waited for about two hours in a small room she described as a break room; a function was being held in the station for the public, so people were filtering in and out throughout that time. At one point two officers came in, one of whom, Officer Watson, Ms. Clodfelter recognized as a School Resource Officer; she mentioned to them that she was there with her son, but did not know where he was or why they had been brought in. Officer Watson was exiting the room when the other officer told her that defendant Clodfelter had been brought in on a murder investigation. Ms. Clodfelter "realized that [she] was getting ready to throw up[,]" and Officer Watson escorted her to the bathroom, where she was sick.

When she exited the bathroom, Detective Walls had returned. Ms. Clodfelter was told that defendant Clodfelter had been brought in because of "something to do with the murder in Kernersville." Ms. Clodfelter named the victim, whose name she remembered both because murder is a rare thing in Kernersville and because, when it happened, defendant Clodfelter commented on a news story on the murder to her. At that point, Detective Walls hugged her and told her she could help defendant Clodfelter and "we need for you to talk to him for us[.]" She and Detective Walls then went into the room with defendant Clodfelter.

Ms. Clodfelter sat next to Special Agent Mayes, while Detective Walls sat next to defendant Clodfelter. Per her testimony, Ms. Clodfelter then had the following exchange with her son:

> And I just said, "Okay. If you were there—I don't know what happened, but you've got to tell the truth because this man is gone. He's never coming back. His family has lost somebody. If you know who killed him, you've got to tell." And he had sat there for a minute. And he started to cry, and we talked for maybe five minutes. And he busted out crying and he said, "It was me."

The officers then began asking defendant Clodfelter for details on the crime; Ms. Clodfelter testified that they presented a picture to defendant Clodfelter and asked him about specific wounds on the victim's head. Defendant Clodfelter then said "that he would explain to them what happened." Defendant Clodfelter told the officers the substance of the statement described above, starting with how they planned on going to a certain house. Detective Walls offered defendant Clodfelter a break and snack; upon their return, he read defendant Clodfelter his *Miranda* rights and had defendant Clodfelter sign a waiver.

At some point, defendant Clodfelter said he would like to come back to the station and talk about it the next day. Detective Walls stated that they planned to go to the district attorney that night, and "it's only going to get worse[.]" Defendant Clodfelter then wrote out his statement by hand and signed it.

Defendant Clodfelter attempts to paint his mother in part as an inquisitorial agent of the police, who attempted to solicit a statement where they themselves could not. In support of this argument, defendant Clodfelter relies on case law holding that

> unwarned statements made by defendants to private individuals *unconnected with law enforcement*, if made freely and voluntarily, are admissible at trial. However, when an accused's statements stem from custodial interrogation by one who in effect is acting as an agent of law enforcement, such statements are inadmissible unless the accused received a *Miranda* warning prior to questioning.

*State v. Morrell*, 108 N.C. App. 465, 470, 424 S.E.2d 147, 150-51 (1993) (citations omitted). However, the cases on which defendant Clodfelter relies for this argument involve statements made to individuals who were actual government employees: a social worker in the case of *Morrell*, *id.* at 469, 424 S.E.2d at 150, and a sanitation worker in the case of *State v. Hauser*, 115 N.C. App. 431, 436-37, 445 S.E.2d 73, 77-78 (1994). Further, in both cases, the individuals were either encouraged or actively recruited to act as agents of the police to obtain incriminating information. *Id.* Such is not the case here. Ms. Clodfelter herself testified that all the officers asked her to do, and all she in fact did do, was ask her son to tell the truth about his involvement in the crime. Such actions do not rise to the level of Ms. Clodfelter acting as an agent of the police.

3. *Requests for Lawyer and to Leave*

**[7]** Finally, defendant Clodfelter argues that police ignored his repeated requests for a lawyer and to leave the police station and return the next day, making his statement to the police involuntary and thus inadmissible.

As to his requests for a lawyer, as can be seen from his mother's testimony set out above, defendant Clodfelter made those requests *to his mother*, not to any police officer. Indeed, even defendant Clodfelter himself does not argue that he made such a statement to any officer; in his arguments to this Court, he states only that it is "reasonable" to assume that the officers heard defendant Clodfelter's statement to his mother. We are unwilling to make such a factual inference.

As to his request to leave, his mother stated that the request was in fact an offer to come back the next day to continue their discussion. Per N.C. Gen. Stat. § 7B-2101(c), "If the juvenile indicates in any manner and at any stage of questioning pursuant to this section that the juvenile does not wish to be questioned further, the officer shall cease questioning." N.C. Gen. Stat. § 7B-2101(c) (2009). We agree with the State that, if anything, defendant Clodfelter's offer to continue speaking with the officers the next day was an indication not that he did not wish to be questioned further, but rather that he was perfectly willing to talk with the officers. As such, we overrule this argument.

B. *Joinder and Redaction of Statement*

**[8]** Next, defendant Clodfelter argues that the trial court erred by granting the State's motion for joinder and by not redacting defendant Jessup's statement elicited by police. We disagree.

Normally, "[t]he question of whether defendants should be tried jointly or separately is within the sound discretion of the trial judge, and the trial judge's ruling will not be disturbed on appeal absent a showing that joinder has deprived a defendant of a fair trial." *State v. Evans*, 346 N.C. 221, 232, 485 S.E.2d 271, 277 (1997). However, while defendant *Jessup* made repeated objections to the introduction of defendant Clodfelter's statement as read into the record by Special Agent Mayes, defendant *Clodfelter* himself never made such an objection. As such, this error was not properly preserved regarding the introduction of the statement, and we review defendant Clodfelter's arguments on this point for plain error. N.C. R. App. Proc. 10(b)(4) (2008). Again, therefore, defendant Clodfelter must show that "there

IN THE COURT OF APPEALS 75

COMBS v. CITY ELEC. SUPPLY CO.

[203 N.C. App. 75 (2010)]

is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" N.C. Gen. Stat. § 15A-1443(a) (2009). As noted above, even without defendant Jessup's statement, the jury heard from Marcus Bowen that defendant Clodfelter planned and orchestrated the robbery and shot the victim. As such, we overrule this assignment of error.

III.

We hold that defendant Clodfelter received a trial free from error and that any error in defendant Jessup's trial was not prejudicial error.

No error.

Judges WYNN and CALABRIA concur.