STATE OF NORTH CAROLINA v. BRENDA GAY MORRELL

No. 9123SC933

(Filed 5 January 1993)

1. **Evidence and Witnesses § 1233 (NCI4th) — confession to social worker — agent of State — absence of Miranda warnings — admission as harmless error**

Defendant's confession to a social worker without the benefit of *Miranda* warnings was obtained in violation of her Fifth Amendment right against self-incrimination where (1) the social worker's interview of defendant amounted to custodial interrogation because defendant was incarcerated in the Mecklenburg County jail and the social worker asked her specific questions about her sexual activities with a twelve-year-old boy, and (2) the social worker was acting as an agent of the Wilkes County Sheriff's Department because she had begun working with the Sheriff's Department on the case prior to interviewing defendant and her investigation was made at least in part for the purpose of obtaining information with which to initiate criminal proceedings against defendant. However, defendant was not prejudiced by the admission of this confession in light of the proper admission of defendant's subsequent, more inculpatory confession to a detective and the strong evidence of defendant's guilt.

**Am Jur 2d, Evidence §§ 554, 555, 556.**

**What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

STATE v. MORRELL

[108 N.C. App. 465 (1993)]

2. **Evidence and Witnesses § 1227 (NCI4th)— inadmissible confession to social worker—subsequent confession to detective not inadmissible**

   Defendant's confession to a detective after proper *Miranda* warnings was not rendered inadmissible by defendant's prior inadmissible confession to a social worker without *Miranda* warnings where the record established that defendant's earlier statement to the social worker was not coerced or made under circumstances calculated to undermine her free will but was made freely and voluntarily.

   **Am Jur 2d, Evidence §§ 537, 582.**

3. **Constitutional Law § 367 (NCI4th)— consecutive life sentences—no cruel and unusual punishment**

   The imposition on defendant of two consecutive life terms for two counts of first degree rape of a child, two counts of first degree sexual offense against a child, two counts of taking indecent liberties with a child, and one count of child abduction did not constitute cruel and unusual punishment since defendant could have received four life sentences for the rapes and sexual offenses had the trial court not consolidated the cases for sentencing.

   **Am Jur 2d, Criminal Law §§ 625, 626, 629.**

   **Comment note—length of sentence as violation of constitutional provisions prohibiting cruel and unusual punishment. 33 ALR3d 335.**

Appeal by defendant from judgments entered 24 April 1991 in Wilkes County Superior Court by Judge James A. Beaty. Heard in the Court of Appeals 10 November 1992.

   *Attorney General Lacy H. Thornburg, by Special Deputy Attorney General James Peeler Smith, for the State.*

   *Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Mark D. Montgomery, for defendant-appellant.*

GREENE, Judge.

Defendant appeals from judgments entered on 24 April 1991, which judgments are based on jury verdicts convicting defendant

of two counts of first degree sexual offense, N.C.G.S. § 14-27.4 (1986), one count of abduction of a child, N.C.G.S. § 14-41 (1986), two counts of first degree rape, N.C.G.S. § 14-27.2 (1986), and two counts of indecent liberties, N.C.G.S. § 14-202.1 (1986).

The evidence presented by the State tends to establish that Christopher, who was twelve years old at the time of trial, lived during the summer and fall of 1990 in Roaring River, North Carolina, with his mother and step-father, Jack Nunnary (Nunnary), and defendant Brenda Morrell, who was twenty-nine years old at the time of trial. Christopher's parents, who were long-distance truck drivers, had met defendant on a trip and had brought her to their home to live as, according to Christopher, "Mom's girlfriend." Christopher characterized defendant and Nunnary as his "babysitters." Defendant shared a bedroom with Christopher's parents, and Christopher and Nunnary each had a separate bedroom. Christopher often watched sexual activity between defendant and his parents through a grating in his room.

Christopher testified that one evening in August, 1990, he was asked to come down to his parents' bedroom. Upon entering the room, he saw his mother and defendant rubbing lotion on each other, after which they had "intercourse," which Christopher described as "my mom . . . sticking her finger up . . . [defendant's] mid-section." At the same time, Christopher observed his step-father "sticking his penis in [my mom's] butt." Christopher then "climbed on top of [defendant] and put . . . my penis in her mid-section," or vagina, and had intercourse with her. Afterwards, his step-father told him to take a cold shower and go to bed, which he did. Christopher testified that he and defendant "played house" on two subsequent occasions when Christopher's parents were "out on the road" and Nunnary was at work. On both occasions, defendant performed oral sex on Christopher prior to their having intercourse, and, on the latter occasion, Christopher performed oral sex on defendant after intercourse. Nunnary learned that Christopher and defendant had been having sex when he and Christopher's parents were not at home and told the parents, who demanded that defendant leave their home.

On 13 October 1990, defendant returned to Christopher's home. Christopher was alone, and defendant asked if she could take a hot shower and get some clothes. Defendant told Christopher to get some of his clothes ready because he was "going to go on

a long trip." Christopher told defendant that he did not want to go on a long trip. They began walking down the highway, and, according to Christopher, he tried to get away but defendant caught him. After a short time walking, they began hitchhiking and were picked up by a truck driver who took them to Washington, D.C., where defendant insisted that Christopher use a false name. After two days there, defendant and Christopher went to defendant's parents' home in Maryland, where they remained until law enforcement authorities came for Christopher. On 18 October 1990, Christopher was transported to Charlotte, North Carolina, where he was met at the airport by Chris Shew (Shew), chief detective of the Wilkes County Sheriff's Department, and Stephanie Broyhill (Broyhill), a social worker in the child protective services unit of the Wilkes County Department of Social Services. Christopher told Shew and Broyhill about the events surrounding his association with defendant.

Broyhill testified that on 5 November 1990, she talked with defendant while defendant was in custody at the Mecklenburg County jail after having been arrested on a federal charge of child abduction. Broyhill told defendant her name and that she was from the Wilkes County Department of Social Services, and that she was conducting an investigation of alleged sexual abuse and neglect of Christopher. Broyhill then testified, over defendant's objection, that defendant told her that she had had sexual relations with Christopher on an occasion when she and Christopher's parents were in their bed with Christopher. Defendant also indicated to Broyhill that on another occasion, she did not actually have intercourse with Christopher but that Christopher "ate her cookie" and that she tried to give him "a blow job" but he pushed her away. Defendant told Broyhill that on a third occasion, Nunnary overheard her asking Christopher if he "wanted to play house," which resulted in defendant leaving the home. Broyhill testified that during the interview defendant was very calm, cooperative, and matter of fact.

Detective Shew testified that on 7 November 1990, he and a deputy went to the Mecklenburg County jail to take defendant into custody and transport her back to Wilkes County. Shew testified that, upon entering the vehicle, he warned her pursuant to *Miranda*, after which defendant indicated that she understood her rights and agreed to talk to Shew without a lawyer. Upon arrival at the Wilkes County Sheriff's Department, Shew again gave defendant a *Miranda* warning, and defendant again waived her right to

an attorney and signed a form to that effect. Defendant then made a formal statement which, over defendant's objection, Shew read to the jury. In her statement, defendant indicated that she had had intercourse with Christopher on two occasions, that she had performed oral sex on him once, and that he had performed oral sex on her once. Defendant also stated that Christopher left North Carolina and went to Maryland with her voluntarily.

Defendant presented no evidence. Prior to trial, defendant made a motion in limine seeking to exclude all evidence regarding defendant's statement to Broyhill on the ground that she was not informed of her *Miranda* rights prior to making the statement. In the same motion, defendant also sought to exclude evidence regarding the statement made to Shew on the ground that, after being advised of her rights, defendant asked to confer with an attorney and was not granted this request. The trial court denied defendant's motion.

The jury convicted defendant of two counts of first degree rape in August and September, 1990, two counts of taking indecent liberties with a child in August and September, 1990, one count of first degree sexual offense involving fellatio, one count of first degree sexual offense involving cunnilingus, and one count of abduction of a child. The trial court consolidated the charges and sentenced defendant to two consecutive life terms. Defendant appeals.

The issues presented are whether (I) Broyhill's failure to inform defendant of her Fifth Amendment right to remain silent and to the presence of counsel prior to questioning defendant in the Mecklenburg County jail renders defendant's statement inadmissible; and (II) if so, whether defendant's subsequent warned confession to Detective Shew is inadmissible as "fruit of the poisonous tree."

I

Defendant argues that evidence regarding her statement to social worker Broyhill should have been excluded as obtained in violation of her Fifth Amendment privilege against self-incrimination because Broyhill was acting as an agent of law enforcement and therefore was required to inform defendant of her *Miranda* rights prior to the interview at the Mecklenburg County jail.

STATE v. MORRELL

[108 N.C. App. 465 (1993)]

A suspect who is subjected to custodial interrogation is entitled under the Fifth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, to be informed that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he is entitled to have an attorney present during questioning, either retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07 (1966); *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653 (1964). Once informed of his rights, the suspect may voluntarily, knowingly, and intelligently waive them, however, failure to inform a suspect of his rights renders his statements inadmissible. *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 707. "Custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.; State v. Thomas*, 284 N.C. 212, 216, 200 S.E.2d 3, 7 (1973). For Fifth Amendment purposes, included within the meaning of "questioning" are any actions that police "should know are reasonably likely to elicit an incriminating response from a suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980).

It is well-established in North Carolina that unwarned statements made by defendants to private individuals *unconnected with law enforcement*, if made freely and voluntarily, are admissible at trial. *State v. Etheridge*, 319 N.C. 34, 43, 352 S.E.2d 673, 679 (1987) (emphasis added). However, when an accused's statements stem from custodial interrogation by one who in effect is acting as an agent of law enforcement, such statements are inadmissible unless the accused received a *Miranda* warning prior to questioning. *See id.* at 44, 352 S.E.2d at 679; *State v. Nations II*, 319 N.C. 329, 331, 354 S.E.2d 516, 518 (1987); *see also Estelle v. Smith*, 451 U.S. 454, 466-68, 68 L. Ed. 2d 359, 371-72 (1981) (Court ruled inadmissible defendant's unwarned statement, made while in jail, to court-appointed psychiatrist who was "essentially an agent of the state"); *Cates v. State*, 776 S.W.2d 170 (Tex. Crim. App. 1989) (incarcerated defendant's unwarned child abuse confession made to social services worker inadmissible in light of court's determination that social worker was acting as agent of law enforcement). Thus, if in the instant case the totality of the circumstances reveals that the interview of defendant amounted to a "custodial interrogation" by Broyhill, acting either wholly or in part as an agent of

the Wilkes County Sheriff's Department, then defendant was entitled to a *Miranda* warning and Broyhill's failure to provide such warning renders defendant's statement inadmissible.

## Custodial Interrogation

Because it is undisputed that defendant was incarcerated in the Mecklenburg County jail and thus had been deprived of her freedom at the time of Broyhill's interview, defendant was in "custody." Thus, the assessment of the interview as a "custodial interrogation" turns upon its characterization as an "interrogation." Assuming for the purposes of this analysis that Broyhill was acting as an agent of law enforcement, Broyhill "interrogated" defendant if she expressly questioned defendant or if she should have known that her actions were reasonably likely to elicit an incriminating response from defendant. Given the fact that Broyhill, by her own admission, asked defendant specific "questions about the various incidents that Christopher had related to me," including defendant's sexual activity with Christopher, a child under the age of thirteen, Broyhill's interview with defendant amounted to an interrogation for Fifth Amendment purposes.

## Broyhill As State Agent

In the companion cases of *State v. Nations I* and *II*, our Supreme Court addressed, among other things, a defendant's argument that the social worker to whom he made an incriminating statement while incarcerated, after having previously been warned and invoking his right to counsel, was an agent of the State for Fifth and Sixth Amendment purposes. *State v. Nations I*, 319 N.C. 318, 354 S.E.2d 510 (1987); *State v. Nations II*, 319 N.C. 329, 354 S.E.2d 516 (1987). The defendant in *Nations I* and *II* was incarcerated after having been arrested on charges of child sexual abuse. After initially agreeing to talk with police officers, he changed his mind and invoked his right to counsel. A few days later, he asked the jailer if he could see someone from "mental health." The jailer referred this request to a social worker who happened to be arriving at the jail for the purpose of interviewing the defendant. The social worker's visit was prompted by an earlier telephone call from a woman who informed him that the defendant had sexually molested her daughter and was currently in jail on unrelated charges.

When asked by the defendant if their conversation would be confidential, the social worker told the defendant that he had an obligation to report to the District Attorney if he learned that a crime had been committed. The defendant nevertheless indicated that he wanted to "clear his conscience" and confessed to having sexually abused the child. The defendant told the social worker that he would be willing to talk with a police officer, to whom he also confessed. The specific issue before the Court in *Nations II* was whether the social worker's interview with the defendant constituted a "subsequent police-initiated interrogation" in violation of the defendant's Fifth Amendment right to the presence of counsel. The Court upheld the trial court's conclusion that no violation had occurred, emphasizing that, because the social worker was not an agent of law enforcement (as determined in *Nations I*), his contact with defendant was not "police-initiated." The Court also held that the confession to the social worker was not the product of custodial interrogation because there was no evidence that by allowing the interview, which was not police-initiated, the police were reasonably likely to elicit an incriminating response.

In upholding in *Nations I* the trial court's conclusion that the social worker was not an agent of the police, the Court determined that there was competent evidence to support the trial court's findings that the social worker (1) was not a sworn law enforcement officer, had no arrest power, and was not affiliated in any way with any law enforcement agency, and (2) did not visit the defendant at the direction of any law enforcement agency or for the purpose, either wholly or in part, of obtaining information with which to initiate further criminal proceedings against the defendant.

Under very different facts, the trial court in the instant case in its order denying defendant's motion to suppress made the following relevant findings, which are almost identical to those made by the trial court and upheld in *Nations I*:

Broyhill was not a sworn enforcement officer nor did she have any type of arrest power, criminal jurisdiction, or affiliation in any way with law enforcement authorities.

. . . .

Based upon the information available to the Court at the time of the April 29, 1991 session of Court, the Court finds that the contact made by Stephanie Broyhill with the defend-

ant was not initiated by any law enforcement agency requesting an interview by her with the defendant on behalf of that law enforcement agency. But rather the Court finds that the interview of the defendant by Mrs. Broyhill was conducted as a part of her agency's investigative policies.

In addition the Court finds that the planned interview by Mrs. Broyhill of the defendant was not at the direction of any law enforcement agency charged with the enforcement of criminal statutes and further that the interview so conducted was not made wholly or in part for the purpose of obtaining information with which to initiate criminal proceedings against the defendant.

Findings of fact regarding the admissibility of a confession are conclusive if supported by competent evidence. *State v. Simpson*, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985). It is undisputed that Broyhill was not a sworn law enforcement officer with arrest power. However, unlike in *Nations I* and *II*, where the record established that the social worker's contact with the defendant was prompted by both the defendant's request and a mother's telephone call, the record in the instant case contains no evidence to support the trial court's finding that the contact made by Broyhill with defendant "was not initiated by any law enforcement agency requesting that Broyhill interview the defendant" and that Broyhill had no "affiliation in any way with law enforcement authorities." To the contrary, the record establishes that Broyhill and Detective Shew had been in contact with each other as early as 18 October 1990, when they, together, met Christopher at the Charlotte Airport upon his return by authorities from Maryland, and, together, interviewed Christopher in order to obtain information regarding his sexual encounters with defendant and his parents. Furthermore, although Broyhill testified that she participated on behalf of the Department of Social Services in the investigation of Christopher's case, given her early association with Detective Shew, there is no evidence to support the court's finding that Broyhill's investigation was not made at least *in part* for the purpose of obtaining information with which to initiate criminal proceedings against defendant.

We are aware that the Department of Social Services has a statutory duty to report findings of child abuse to the district attorney. N.C.G.S. § 7A-548(a) (1989 & Supp. 1992). However, when

Broyhill went beyond merely fulfilling her role as Christopher's social worker and began working with the Wilkes County Sheriff's Department on the case *prior to* interviewing defendant, eventually testifying for the State at defendant's trial, Broyhill's "role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Estelle*, 451 U.S. at 467, 68 L. Ed. 2d at 372. Accordingly, because Broyhill did not advise defendant of her *Miranda* rights, the trial court erred in denying defendant's motion to suppress statements made during her interview with Broyhill.

II

**[2]** Defendant argues that, because her statements to Broyhill were obtained in violation of *Miranda* and are therefore inadmissible, defendant's subsequent *warned* statement to Detective Shew constitutes fruit of the earlier inadmissible statement and is likewise inadmissible.[1]

The Fifth Amendment requires suppression of a confession that is the fruit of an earlier statement obtained in violation of *Miranda* only when the earlier inadmissible statement is "coerced or given under circumstances calculated to undermine the suspect's ability to exercise his or her free will." *Oregon v. Elstad*, 470 U.S. 298, 309, 84 L. Ed. 2d 222, 232 (1985); *State v. Barlow*, 330 N.C. 133, 138-39, 409 S.E.2d 906, 910 (1991). We need not decide whether the statement given by defendant to Detective Shew after defendant had waived her *Miranda* rights constitutes "fruit" of her earlier statement to Broyhill, because the record establishes that defendant's earlier statement to Broyhill was neither coerced nor made under circumstances calculated to undermine her free will.

The "voluntariness [of a confession] is determined in light of the totality of the circumstances surrounding the confession." *Barlow*, 330 N.C. at 140-41, 409 S.E.2d at 911 (citing *State v. Richardson*, 316 N.C. 594, 601, 342 S.E.2d 823, 829 (1986)). Some factors to be considered are "whether the defendant was in custody when

---

1. The trial court found that defendant's confession to Shew was made after defendant freely, knowingly, understandingly, and intelligently waived her rights under *Miranda*, and defendant does not argue otherwise before this Court. Defendant confines her argument to the inadmissibility of the confession to Shew based on it being fruit of the prior inadmissible statement to Broyhill.

he made the statement; the mental capacity of the defendant; and the presence of psychological coercion, physical torture, threats, or promises." *Id.* at 140, 409 S.E.2d at 911. Although in the instant case defendant was in custody when she spoke with Broyhill, that fact alone is not determinative. The trial court found that defendant freely gave statements to Broyhill about her involvement with Christopher, without any threat or promise and without any duress, and that defendant was not suffering from any mental or emotional disorder or disease at the time the statements were made, nor was she impaired or disabled. The court concluded based on these findings that the unwarned statements made by defendant to Broyhill were voluntary. The court's findings are supported by the evidence in the record, and, accordingly, we are bound by them. *Simpson,* 314 N.C. at 368, 334 S.E.2d at 59. Thus, we uphold the trial court's denial of defendant's motion to suppress the statement given to Detective Shew.

**[1]** Because we have determined that defendant's confession to Detective Shew, the content of which is more inculpatory than that of defendant's statement to Broyhill, was properly admitted at trial, and in light of the strong evidence of defendant's guilt in the form of Christopher's testimony, the State has met its burden of showing that the erroneous admission of defendant's statement to Broyhill was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1988) (defendant entitled to new trial unless State shows that constitutional error is harmless beyond a reasonable doubt).

### III

**[3]** Defendant argues that her sentence of two consecutive life terms constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

It is well-settled that a life sentence for first-degree sexual offense committed upon a child, even when committed without verbal or physical abuse or violence, does not violate the Eighth Amendment. *State v. Higginbottom,* 312 N.C. 760, 762-64, 324 S.E.2d 834, 837 (1985). In the instant case, defendant was convicted of, among other things, two counts of first-degree sexual offense and two counts of first-degree rape, all Class B felonies punishable by mandatory life imprisonment. N.C.G.S. § 14-1.1(a)(2) (1986). Had the trial court not consolidated the cases for sentencing, defendant by statute would have been subject to four life terms. "Since it

is the function of the legislature and not the judiciary to determine the extent of punishment to be imposed, we accord substantial deference to the wisdom of that body." *Higginbottom*, 312 N.C. at 763-64, 324 S.E.2d at 837. Accordingly, we reject this assignment of error.

We have reviewed defendant's remaining assignments of error, and have determined that they are either without merit or do not constitute prejudicial error entitling defendant to a new trial.

No error.

Judges WYNN and WALKER concur.