INMAN, Judge.
Defendant Radhwan Al-Hamood ("Defendant") appeals from judgments entered following a jury verdict finding him guilty of three counts of first degree forcible sexual offense, one count of intimidating a witness, one count of assault on a female, and one count of communicating threats. Defendant argues the trial court erred in: (1) denying his motion to dismiss the first degree forcible sexual offense charges for insufficient evidence; (2) allowing the prosecutor to repeatedly ask a witness about the Defendant's alleged physical abuse of his children when the trial court had previously ruled such evidence inadmissible; (3) denying Defendant's motion for a mistrial; and (4) denying Defendant's motion to suppress certain evidence. After careful review, we hold the Defendant has failed to demonstrate error.
I. FACTUAL AND PROCEDURAL HISTORY
The evidence introduced at trial indicates the following:
In 2006, Defendant and M.A. ("Maggie")[1] were married in Iraq. They had four children, Y.A. ("Yates"), R.A. ("Ramona"), K.A. ("Keane"), and R.A. ("Rachel"). Defendant worked with the United States Armed Forces during the Iraq War. He was offered the opportunity to move himself and his family to the United States in 2013, and ultimately settled in Raleigh, North Carolina. Maggie found immediate employment with a hotel; Defendant stayed home. After a workplace accident rendered Maggie unable to work for eight months, Defendant took a job in a restaurant. When she was able, Maggie returned to work, operating a bakery with Defendant.
On the evening of 22 October 2016, Defendant woke Maggie up, dragged her out of bed, and beat her (the "October Assault"). Defendant had been drinking. After telephoning Maggie's brother in Baghdad, Defendant kicked Maggie out of the home, shoeless and in her pajamas. Maggie walked to a nearby gas station and telephoned the police. Law enforcement responded and arrested Defendant for assault on a female. Officers who arrived at the scene observed that Maggie had suffered a laceration on her arm.
Defendant was released from jail with a restraining order prohibiting him from contacting Maggie. Defendant ignored the court order and returned home immediately. As the court dates for his assault charge approached, Defendant coached Maggie on what to say to others, including that any bruises or injuries she suffered were self-inflicted. Maggie complied with Defendant's directions, relaying those statements to Defendant's attorney in the assault case.
On 19 December 2016, Defendant again struck Maggie while they were working at the bakery (the "December Assault"). That evening, Maggie fled the home after Defendant had fallen asleep. Maggie wandered the streets from 2:00 a.m. until 6:00 a.m., searching for someone to drive her to the police station. She was eventually successful and was able to meet with police on the morning of the 20th. Maggie reported that Defendant assaulted her with a belt and a closed fist and that Defendant had sexually assaulted her. A female officer photographed Maggie's injuries, which included bruises on her torso, face, and buttocks. Police then transferred Maggie to Interact, a domestic violence rape crisis center in Wake County. A nurse at Interact performed a sexual assault examination on Maggie, observing bruises above both eyes, significant swelling to her lower jaw, bleeding gums, swelling in her hand, abrasions on her chest and hand, and bruises along her face, back, and buttocks. Maggie reported severe pain in her anus, and an internal exam revealed swelling of the perianal skin consistent with sexual assault. The nurse completed a sexual assault kit and delivered it to law enforcement; the vaginal swab in the kit tested positive for Defendant's DNA. While Maggie was at Interact, law enforcement travelled to the family home and arrested Defendant. The police also looked after the couple's four children, reuniting them with Maggie at Interact later that day.
The Wake County Department of Human Services assigned Richard Guinoo ("Mr. Guinoo"), a Child Protective Services assessor, to Maggie and the children. As part of his duties as an assessor assigned to the family, Mr. Guinoo met with Defendant while he was in jail for the assault on a female charge stemming from the October Assault. The two discussed whether Defendant had committed a sexual offense. Defendant spoke with Mr. Guinoo without an attorney present, and Mr. Guinoo did not read Defendant his Miranda rights. Mr. Guinoo's documents were later subpoenaed by law enforcement, at which time he provided them to police.
Defendant was indicted by a Wake County Grand Jury on three counts of first degree forcible sexual offense, one count of assault on a female, one count of communicating threats, and one count of intimidating a witness. One count of first degree forcible sexual assault concerned the December Assault; the other two forcible sexual assault charges alleged offenses occurring between the October and December Assaults. Defendant filed a motion in limine seeking to exclude evidence of alleged physical abuse of Yates, Ramona, Keane, and Rachel perpetrated by Defendant, and a motion to suppress a report produced by Mr. Guinoo following his interview of Defendant. The trial judge heard those motions prior to trial and reserved his rulings.
Defendant's case came on for trial on 2 January 2018. Prior to receiving any testimony, the trial court allowed Defendant's motion in limine to exclude evidence of domestic violence perpetrated by Defendant against his children. Maggie was the first witness to testify, laying out in detail years of alleged abuse by Defendant. Specifically, she testified that a few months into their marriage, Defendant began drinking and turning violent, beating Maggie on a daily basis. The beatings occurred while Maggie was pregnant and, on one occasion, Defendant dragged his pregnant wife down a flight of stairs with the help of his brother. These beatings continued for the entire eleven-year span of the marriage, growing worse after the couple moved to the United States. Defendant increased the intensity and severity of his abuse, striking Maggie with broomsticks, belts, and his fists. Maggie would occasionally lose consciousness from the beatings, at which point Defendant would revive her by pouring food or hot water on her. Defendant told his wife he would bury her in the backyard if she ever sought help or disclosed his acts of violence.
Maggie provided a detailed description of the October Assault. She testified that Defendant had been drinking when he woke her up and began beating her with a broomstick. He also called Maggie's brother, stating three times on the phone that he was divorcing Maggie-an act that, in her family and culture, burdened her with the same taboo as adultery.
Maggie also provided a thorough account of the December Assault. She testified that she was working at the bakery on 19 December when her husband grew angry and struck her with a wooden kitchen implement. Maggie was worried she had internal bleeding from the beating and asked Defendant to take her to the doctor; Defendant refused, and instead offered her a cream to cover any visible injuries for his upcoming court date on the then-pending assault on a female charge. When Defendant and Maggie were at home later that day, Defendant began cussing at Maggie and hitting her with a belt. His beatings continued through the evening until midnight, at which point he bent Maggie over the couch and forcibly penetrated her anus with his penis against her will. Maggie testified that Defendant told her she "was an animal and that this is how you treat animals[,]" and that she could not stop him because he continued hitting her. Defendant eventually ceased his sexual assault and went to bed; once he was asleep, Maggie grabbed her phone and fled. She stated that she suffered pain in her anus and bladder, bladder infections, tingling in her right leg, and hemorrhoids as a result of the assaults.
Maggie testified that Defendant had sexually assaulted her at various times between October and December of 2017. She stated that when he got drunk, Defendant would force bottles inside of her vagina and, in one instance, inside her anus. Maggie was too scared to resist Defendant due to his threats and beatings; in the one instance when Maggie tried to physically resist, Defendant screamed and pushed her.
Yates also testified for the State. He testified that he saw a purple mark on Maggie on the night of the October Assault, and that he witnessed Defendant beat Maggie with a belt and a broom during the December Assault. He further disclosed that he had seen his father beat Maggie on multiple occasions with his fists, a broom, "and a lot [with] the belt."
Ramona, too, testified that she had seen Defendant beat Maggie with a belt, on one occasion pushing her to the floor and putting a bowl of food on her face. She also stated that she had never seen her parents happy together. She further testified, over Defendant's objection, that he was arrested because "he was doing bad stuff to [the children] and [their] mom."
Mr. Guinoo also testified during the trial. First, the trial court allowed a voir dire examination of Mr. Guinoo on Defendant's motion to suppress. Afterwards, the trial court denied the motion, concluding that Mr. Guinoo's interviews were not custodial interrogations subject to the Fifth and Sixth Amendment of the United States Constitution. On direct examination following voir dire , Mr. Guinoo testified to much of the abuse relayed to him by Maggie and the children, adding that Defendant instructed the children to demean Maggie by calling her "servant" instead of "mom." The prosecutor asked Mr. Guinoo whether Maggie told him about any threats or abuse directed at the children, to which Defendant's counsel objected. The trial court sustained the objection and struck the question. Following cross-examination in which Defendant's counsel asked Mr. Guinoo about whether the children missed their father while he was in prison, the prosecutor on re-direct asked if the children expressed fear of their father. Defendant's counsel again objected, and that objection was sustained. The prosecutor pressed the issue, however, by asking why the children did not miss their father. Mr. Guinoo stated it was because they were scared of him, and the prosecutor followed up by asking why. Over a series of objections, Mr. Guinoo testified that the children did not miss Defendant because he had hit them. After discussion with counsel outside the presence of the jury, the trial court sustained the objection as to the violence against the children and instructed the jury not to consider it.
At the close of the State's evidence, Defendant moved to dismiss the charges of first degree forcible sexual offense. Specifically, Defendant's counsel argued that the State had failed to introduce evidence of infliction of serious personal injury, an essential element of the offense. The motion was denied.
Defendant testified in his own defense. He admitted drinking on the night of the October Assault, and that he dragged Maggie out of bed before striking her with his hand. He testified that he did so because he saw explicit text messages on her phone between her and another man. He further stated that he did call Maggie's brother, but only to inform him of the text messages. Defendant testified that Maggie began to hit herself, as "[a]ll the women in the Middle East and especially Iraqi women, when something happened with them like this, they started hitting on themselves. They start hitting their bodies because basically they have that stigma and everything is disclosed."
Defendant also admitted to a portion of Maggie's account of the December Assault. He admitted hitting Maggie in the face with his hand at the bakery. He denied hitting Maggie with a belt, instead stating that he "used the belt, ... but just as a reminder. ... I hit the ground with the belt and I hit the wall with the belt." He did so "to make her afraid[.]" He admitted that he hit Maggie again that same night at home after work, testifying that he injured her by pushing her into a wall. And, although he testified early on that he never hit his wife with any objects, he admitted to throwing a plate at her in their home that evening, striking her in the face. He categorically denied sexually assaulting his wife by force, positing that his wife made false accusations against him in part because he was cheating on her.[2] He did, however, acknowledge that he "was aggressive towards [Maggie] during that period of time[.]"
On cross-examination, Defendant testified that, despite admitting to striking Maggie on multiple occasions, that he did not "get to hit anyone." The prosecutor followed up, which led to the following exchange:
[THE STATE]: So you said you don't get to hit anyone?
[DEFENDANT]: Impossible.
[THE STATE]: Impossible?
[DEFENDANT]: Impossible.
[THE STATE]: But you hit [Maggie]?
[DEFENDANT]: I hit [Maggie] because of the situation. ...
[THE STATE]: And you also hit your kids?
[DEFENDANT'S COUNSEL]: Objection.
....
THE COURT: Sustained. Disregard any question about whether or not he struck his kids.
Defendant's counsel subsequently moved for a mistrial, arguing that the prosecutor's repeated questioning about Defendant's alleged abuse of his children constituted substantial and irreparable prejudice. The trial court denied the motion. It then reversed its earlier ruling sustaining Defendant's objection and allowed the prosecutor to ask Defendant if he ever hit his children, ruling that his denial in response to the prosecutor's questioning opened the door to that testimony.
Following the close of all evidence, Defendant again moved to dismiss the first degree forcible sexual assault charges. The trial court denied the motion a second time. The jury, after instruction and deliberation, returned guilty verdicts on all counts. The trial court sentenced him to three consecutive terms of 200 to 300 months imprisonment and satellite-based monitoring upon his release. Defendant gave oral notice of appeal in open court.
II. ANALYSIS
A. Standards of Review
We review a motion to dismiss for insufficient evidence to determine whether the State "present[ed] 'substantial evidence of all the material elements of the offense charged and that the defendant was the perpetrator of the offense.' " State v. Campbell , 368 N.C. 83, 87, 772 S.E.2d 440, 444 (2015) (quoting State v. Myrick , 306 N.C. 110, 113-14, 291 S.E.2d 557, 579 (1982)). We "consider the evidence 'in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal.' " Campbell , 368 N.C. at 87, 772 S.E.2d at 444 (quoting State v. Powell , 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980) ).
As for review of a trial court's decision to admit or exclude evidence under Rule 404(b), we examine de novo whether the evidence falls within the rule. State v. Beckelheimer , 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012). By contrast, we review a denial of a motion for mistrial for "a manifest abuse of discretion." State v. Diehl , 353 N.C. 433, 436, 545 S.E.2d 185, 187 (2001). Finally, we examine a trial court's order on a motion to suppress to determine whether its factual findings are supported by competent evidence and whether those findings support its conclusions of law. State v. Jackson , 368 N.C. 75, 78, 772 S.E.2d 847, 849 (2015). Unchallenged findings are binding on appeal while conclusions of law are reviewed de novo . State v. Stanley , --- N.C. App. ----, ----, 817 S.E.2d 107, 110 (2018).
B. Defendant's Motion to Dismiss
Defendant first argues that the trial court erred in failing to dismiss the first degree forcible sexual offense charges for insufficient evidence. Specifically, he contends that there was no evidence Maggie suffered serious personal injury, a necessary element of the crime. N.C. Gen. Stat. § 14-27.26(a)(2) (2017). Having reviewed the relevant law and evidence, we disagree.
The State may demonstrate serious personal injury:
when there is a series of incidents forming one continuous transaction between the rape or sexual offense and the infliction of the serious personal injury. Such incidents include injury inflicted on the victim to overcome resistance or to obtain submission, injury inflicted upon the victim or another in an attempt to commit the crimes or in furtherance of the crimes of rape or sexual offense, or injury inflicted upon the victim or another for the purpose of concealing the crimes or to aid in the assailant's escape.
State v. Blackstock , 314 N.C. 232, 242, 333 S.E.2d 245, 252 (1985). The satisfaction of this element from the evidence is dependent upon each case's underlying facts. State v. Herring , 322 N.C. 733, 739, 370 S.E.2d 363, 367 (1988).
Defendant argues that the evidence introduced at trial only shows injuries consistent with a forcible sex act, i.e. , that the injuries sustained were inherent to the acts themselves and therefore insufficient to elevate the crimes from the second degree to the first. See State v. Roberts , 293 N.C. 1, 13, 235 S.E.2d 203, 211 (1977) (" '[S]erious bodily injury' is not the equivalent of 'by force and against her will.' The latter ... is still sufficient to support a conviction of second degree rape .... A conviction of first degree rape, however, requires not only the carnal knowledge of a female 'by force and against her will' but also the use of a deadly weapon or the infliction of 'serious bodily injury' which overcomes the victim's resistance or procures her submission." (citations omitted)). In making this argument, Defendant ignores substantial evidence of "a series of incidents forming one continuous transaction between the ... sexual offense and the infliction of the serious personal injury." Blackstock , 314 N.C. at 242, 333 S.E.2d at 252.
The State introduced evidence that Defendant beat Maggie daily, that he hit her "hundreds of times[,]"and that she was "always fearful of him, frightened of him. [She could not] speak louder than usual because he [would] hit [her]." Maggie testified that, on at least one of the multiple occasions when Defendant forced a bottle inside of her, she attempted to resist him until he screamed and pushed her. Following these sex acts, Maggie suffered pain in her bladder and back, as well as hemorrhoids and a bladder infection. As a result of the daily beatings, Maggie testified her body was "full of bruises, scars, injuries." In recounting the December Assault, Maggie testified that Defendant beat her continuously throughout the afternoon until late in the evening, at which point he forced her over a couch and engaged in anal intercourse. Her injuries sustained in the December Assault included swelling in her lower jaw, bleeding in her mouth, severe pain in her neck, mouth, left eye, and forehead, an abrasion and swelling of the right hand, bruising across her face, back, chest, and buttocks, and severe pain and swelling in the perianal skin. Maggie testified that Defendant dislocated her jaw with his strikes, and in regard to the sexual assault she testified that "[she] couldn't stop him. Because he was hurting me and hitting me ." (emphasis added). She also stated that she did not resist Defendant "because [she was] afraid of him. He hits." When asked if the December Assault was the first such sexual act, Maggie stated that "[i]t was more than once .... And it was probably the second time."[3] This evidence, taken in the light most favorable to the State, establishes infliction of serious bodily injury; Defendant's continuous physical assaults rendered Maggie unable to resist Defendant's forced sex acts, and, contrary to his contention on appeal, his actions inflicted injuries beyond those inherent to forcible and violent sexual penetration. Defendant's argument is overruled.
C. Rule 404(b)
Defendant next contends that the trial court erred under Rule 404(b) in "allowing the prosecutor to repeatedly ask [Mr. Guinoo], over objection, about the Defendant's physical abuse of his children" during the State's presentation of evidence. Rule 404(b) concerns the admissibility of evidence, and the prosecutor's statements are not evidence. State v. Richardson , 226 N.C. App. 292, 303, 741 S.E.2d 434, 442 (2013). The trial court ultimately sustained Defendant's objection to those questions during the State's presentation of evidence, struck the answers, and instructed the jury to disregard them.[4] Even if we were to assume that error arose from these questions, Defendant has failed to demonstrate prejudice. Defendant himself testified to hitting his wife and threatening her with a belt by striking the walls and floor on multiple occasions. Further, both Yates and Ramona testified to Defendant's violence against Maggie. Contrary to Defendant's representations, Maggie's testimony recounting violence-which Defendant categorizes as untrustworthy and admitted under a "jaundiced eye"-was corroborated by every eyewitness to the assaults that testified, including Defendant. For these reasons, we hold that Defendant has failed to demonstrate prejudicial error on this ground.
D. Mistrial
In his third argument, Defendant argues that the trial court erred in denying his motion for mistrial for the same reasons set forth supra Part II.C. Because we hold that Defendant has failed to demonstrate prejudicial error in making that argument, Defendant has not shown an abuse of discretion warranting remand for a new trial. See, e.g., State v. Feimster , 21 N.C. App. 602, 605-06, 205 S.E.2d 602, 604-05 (1974) (holding no abuse of discretion in denying motion for mistrial where the defendant failed to show prejudicial error).
E. Motion to Suppress
Defendant's final argument posits that the trial court erred in denying his motion to suppress statements he made to Mr. Guinoo while he was in jail. Defendant asserts that Mr. Guinoo's interview with Defendant constituted a custodial interview within the meaning of Fifth and Sixth Amendment jurisprudence such that Mr. Guinoo's interview violated his constitutional rights. We disagree.
"It is well-established in North Carolina that unwarned statements made by defendants to private individuals unconnected with law enforcement , if made freely and voluntarily, are admissible at trial." State v. Morrell , 108 N.C. App. 465, 470, 424 S.E.2d 147, 150-51 (1993) (emphasis in original). Thus, an interviewer who is not a law enforcement officer may nonetheless conduct a custodial interrogation implicating the Fifth and Sixth Amendments if the interviewer is "in effect acting as an agent of law enforcement." Id. at 470, 424 S.E.2d at 151. Our Supreme Court has held that a social worker's questioning of a prisoner does not constitute a custodial interrogation implicating a defendant's Fifth and Sixth Amendment rights if the social worker: (1) is not a sworn law enforcement officer, lacks arrest powers, and is unaffiliated with any law enforcement; (2) conducts the interview to further statutory duties as a social worker; and (3) was not directed by law enforcement to conduct the interview and did not do so for the purpose of furthering criminal proceedings. See State v. Nations , 319 N.C. 318, 325, 354 S.E.2d 510, 514 (1987) ("Nations I ") (holding a social worker was not an agent of law enforcement under these facts and did not initiate an "interrogation" within the meaning of Sixth Amendment jurisprudence); State v. Nations , 319 N.C. 329, 331, 354 S.E.2d 516, 518 (1987) ("Nations II ") (holding a social worker was not a law enforcement agent and did not institute a custodial interrogation within the scope of the Fifth Amendment and meaning of Miranda "for the reasons set forth in Nations I "). By contrast, this Court has held a social worker was a law enforcement agent for purposes of Miranda where the social worker had been in contact with law enforcement prior to interviewing the defendant, interviewed the defendant with a detective, and actively participated in the law enforcement investigation. Morrell , 108 N.C. App. at 473-74, 424 S.E.2d at 152-53.
In resolving Defendant's motion to suppress, the trial court found that: (1) Mr. Guinoo "spoke with ... [D]efendant as part of the protocol for Child Protective Services investigations and not at the behest, encouragement, or direction of a law enforcement agency or a law enforcement officer;" (2) no law enforcement officers were party to the interview and "at no time was [Mr. Guinoo] directed by a law enforcement officer as to the questions to be asked or subject matter to be covered;" (3) Mr. Guinoo provided his reports to the State "as a result of a subpoena ... rather than those reports being voluntarily turned over;" and (4) Mr. Guinoo's "purpose for interviewing the defendant was different from that of a law enforcement officer in that he was interviewing the defendant for purposes of protecting the children in the household as a family and not for the purpose of gathering information to charge the defendant with any crimes[.]"
Defendant does not challenge these findings as unsupported by the evidence, and they are therefore binding on this Court. Stanley , --- N.C. App. at ----, 817 S.E.2d at 110. Instead, Defendant argues that the trial court's findings are incomplete and insufficient to support the conclusion that Mr. Guinoo was not acting on behalf of law enforcement.[5] Defendant does not, however, identify what additional findings were necessary. Rather, he intimates that because Mr. Guinoo's reports could be obtained relatively easily via subpoena by the State, Mr. Guinoo was affiliated with the police. We reject such reasoning, as it would render any ordinary member of the public who is subject to a subpoena duces tecum an agent of law enforcement. Nor can we identify what additional findings Defendant believes were necessary for the trial court to reach its conclusion.[6] The trial court, therefore, did not err in denying Defendant's motion to suppress. Nations I , 319 N.C. at 325, 354 S.E.2d at 514 ; Nations II , 319 N.C. at 331, 354 S.E.2d at 518.
III. CONCLUSION
For the foregoing reasons, we hold that: (1) the trial court did not err in denying Defendant's motion to dismiss; (2) Defendant has failed to show prejudicial error in permitting the prosecutor to ask about Defendant's abuse of his children and denying the motion for mistrial; and (3) the trial court properly denied Defendant's motion to suppress.
NO ERROR.
Report per Rule 30(e).
Judges BRYANT and DAVIS concur.

In the interest of privacy and for ease of reading, we refer to the victim and minor children in this action by pseudonym.

Defendant admitted that he had sex with multiple women but denied that he was "womanizing" because they were his friends. He testified that this made Maggie "extremely jealous."

The nurse at Interact, who was qualified as an expert in sexual assault examinations, testified that there was some difficulty in determining which injuries and actions took place on or prior to the December Assault, and "[t]raumatized victims and survivors often bring in different parts of different assaults" in discussing them.

In making this argument, Defendant points only to the questions asked by the prosecutor during the State's presentation of evidence and to which Defendant's objections were sustained. He does not address this argument to the prosecutor's later question on this topic during the cross-examination of Defendant.

The trial court did, in fact, "find[ ] and conclude[ ] as a matter of law that ... Mr. Guinoo was not acting as a law enforcement officer or as an extension of a law enforcement officer[.]"

To the extent that findings concerning Mr. Guinoo's arrest powers were required, his uncontroverted testimony revealed that he is not sworn law enforcement and lacks such powers.